1

2

3

4

5

6

7

8

9

10

11

12            **IN THE UNITED STATES DISTRICT COURT**

13          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

14

15   SCOTT PHIPPS,                              CASE NO. CV F 10-2025 LJO SKO

16                    Plaintiff,               **ORDER ON DEFENDANTS' F.R.Civ.P. 12**
                                               **MOTION TO DISMISS**
17          vs.                                (Doc. 11.)

18   WELLS FARGO BANK, N.A., et al,

19                    Defendants.
     _____/
20

21                            <u>**INTRODUCTION**</u>

22          Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Federal National Mortgage Association

23   ("Fannie Mae") seek to dismiss as legally barred plaintiff Scott Phipps' ("Mr. Phipps'") breach of

24   contract and related claims arising from failure to modify his home loan.  Mr. Phipps responds that

25   Wells Fargo wrongfully denied to consider loan modification under federal programs to entitle Mr.

26   Phipps to pursue his claims.  This Court considered Wells Fargo and Fannie Mae's (collectively

27   "defendants'") F.R.Civ.P. 12(b)(6) motion on the record and VACATES the February 2, 2011 hearing,

28   pursuant to Local Rule 230(g).  For the reasons discussed below, this Court DISMISSES this action.

                                                1

# BACKGROUND

## Summary

In December 2007, Mr. Phipps and his wife Chirld Ann Shagena-Phipps ("Ms. Phipps") obtained a $370,000 refinance loan secured by a Deed of Trust ("DOT") on Mr. Phipps' Tollhouse, California residence ("property"). In July 2009, Ms. Phipps filed for divorce, moved out of the property's home, and ceased payment on the property. Mr. Phipps' retirement income was insufficient for his bills and mortgage payments.

Wells Fargo is a mortgage lender and mortgage loan servicer and was assigned all beneficial interest in the DOT on the property in late 2009. Wells Fargo foreclosed on the property which Fannie Mae purchased at a trustee's sale. Wells Fargo transferred its beneficial interest in the DOT to Fannie Mae in August 2010, and the property reverted to Fannie Mae as the foreclosing beneficiary and grantee.

As discussed in greater detail below, Mr. Phipps pursues breach of contract and related claims arising out of the foreclosure sale occurring prior to expiration of an extension for Mr. Phipps to entertain loan modification terms. Mr. Phipps claims he is entitled to a modification under a federal recovery program.

## The Home Affordable Modification Program

The U.S. Department of Treasury ("DOT") established the Home Affordable Modification Program ("HAMP") pursuant to the Emergency Economic Stabilization Act of 2008 ("EESA"), 12 U.S.C. §§ 5201, et seq. EESA directed DOT to protect home values and other assets of individuals, to preserve home ownership, to maximize returns to taxpayers, and to provide public accountability. HAMP was established pursuant to 12 U.S.C. §§ 5211 and 5219 and, as part of the Troubled Asset Relief Program ("TARP"), authorizes DOT to purchase certain troubled assets. *See* 12 U.S.C. § 5211. To the extent DOT acquires mortgages, EESA directs DOT to maximize assistance of homeowners and to encourage mortgage servicers to take advantage of government programs to minimize foreclosures. *See* 12 U.S.C. § 5219. To further such goals, DOT, through Fannie Mae, entered into agreements with loan servicers. Wells Fargo and Fannie Mae entered into such an agreement dated April 13, 2009 and entitled "Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008

("Servicer Participation Agreement").  The Servicer Participation Agreement committed Wells Fargo to perform certain loan modification and foreclosure prevention services for eligible loans.

### Key Terms

Pursuant to the Servicer Participation Agreement, Wells Fargo as "Servicer **shall** perform the loan modification and other foreclosure prevention services (collectively, the "Services')" described in documentation, including the HAMP Guidelines.  (Bold added; underling in original.)  The Servicer Participation Agreement further provides:

> Servicer **shall** perform the Services for **all** mortgage loans its [sic] services, whether it services such mortgage loans for its own account or for the account of another party, including any holders of mortgage-backed securities (each such other party, an "Investor").   Servicer **shall** use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan under the Program.  (Bold added; underlying in original.)

In exchange for Wells Fargo's modification of eligible loans, the Servicer Participation Agreement requires Fannie Mae to pay Wells Fargo, investors and eligible borrowers certain sums up to a cap of approximately $2.8 billion in aggregate for all of Wells Fargo's loan modifications under the Servicer Participation Agreement.  The Servicer Participation Agreement granted Wells Fargo the ability to opt out if DOT changes HAMP terms.

HAMP's Summary of Guidelines ("Summary") state that HAMP "will offer assistance to as many as 7 to 9 million homeowners, making their mortgages more affordable and helping to prevent the destructive impact of foreclosures on families, communities and the national economy."  According to the Summary, HAMP "will help up to 3 to 4 million at-risk homeowners avoid foreclosure by reducing monthly mortgage payments."

The Summary further provides that participating servicers are "**required** to service all eligible loans under the rules of the program unless explicitly prohibited by contract."  (Bold added.)  HAMP Guidelines further provide:

> Participating servicers are **required** to consider all eligible loans under the program guidelines unless precluded by rules of the applicable [pooling and servicing agreements] and/or other investor servicing agreements.  Participating servicers are **required** to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties.  (Bold in original.)

In addition, HAMP Guidelines require suspension of foreclosure proceedings during a borrower's trial

1 modification period.

2 **Mr. Phipps' Loan Modification Attempts**[1]

3      Given Mr. Phipps' inability to make mortgage payments without assistance of Ms. Phipps, Mr.

4 Phipps' U.S. Department of Housing and Urban Development ("HUD") counselor determined that a

5 HAMP loan modification was Mr. Phipps' "best course of action." HAMP guidelines indicated that Mr.

6 Phipps qualified for a modified $1,000 monthly payment.

7      In August 2009, Mr. Phipps asked Wells Fargo for a HAMP loan modification and submitted

8 a loan modification application and other requested information to Wells Fargo.[2]  Mr. Phipps rejected

9 Wells Fargo's ensuing loan modification offer because "it was more than the current monthly payment

10 amount and not within 31% of his income, as directed by HAMP guidelines."

11      Wells Fargo made another loan modification offer which "was also not within 31% of Plaintiff's

12 income, and Wells Fargo told Plaintiff it was not a HAMP . . . loan, but an 'internal' Wells Fargo

13 program." Mr. Phipps and his HUD counselor contacted Wells Fargo several times to attempt to resolve

14 "the issue of why he had not been considered for HAMP." Although Mr. Phipps was frustrated by his

15 efforts to obtain answers from Wells Fargo, he desired to work with Wells Fargo to save his home, "even

16 if it meant taking the loan outside HAMP guidelines." Prior to the expiration of the second loan

17 modification offer, Wells Fargo granted Mr. Phipps an extension to allow Mr. Phipps to continue

18 working with his HUD counselor and to return loan modification paperwork.

19      Prior to the expiration of the extension, Wells Fargo completed foreclosure of the property which

20 Fannie Mae purchased at a trustee's sale. Mr. Phipps requested Wells Fargo to rescind the foreclosure

21 sale. Wells Fargo agreed to work "to resolve the situation" and approved Mr. Phipps for a loan

22 modification within 31 percent of his income. The loan modification was sent to Wells Fargo's

23 "military section" "by mistake and where it languished for some time." The loan modification was

24 _____

25     [1]    The following recitation of Mr. Phipps' loan modification attempts is derived from Mr. Phipps' operative

26 complaint ("complaint").

27     [2]    Mr. Phipps appears to claim he was eligible for a HAMP loan modification because he was the property's owner-occupant, his loan's principal balance was less than $729,750, the first mortgage lien originated prior to January 1,

28 2009, his monthly mortgage payment exceeded 31 percent of his monthly gross income, and his mortgage payment was unaffordable due to financial hardship capable of documentation.

1   routed to Fannie Mae, which declined to authorize the loan modification in that Mr. Phipps had "ample

2   opportunity" previously to resolve the matter.

3       In response to Mr. Phipps' inquiry whether he should purchase winter fuel, Wells Fargo "assured

4   him it was going to work with him, and he should proceed with his winter fuel delivery." Based on such

5   representations, Mr. Phipps "spent a considerable sum purchasing fuel."

6       Mr. Phipps again requested Wells Fargo to resolve the matter, to rescind foreclosure, and to

7   provide a loan modification.  Wells Fargo offered Mr. Phipps, outside HAMP guidelines, a $1,750

8   monthly payment with $7,500 up front.

9       Fannie Mae instituted an unlawful detainer action against Mr. Phipps in Fresno County Superior

10  Court.

11                          **Mr. Phipps' Claims**

12      On October 28, 2010, Mr. Phipps filed his complaint "to vindicate his own rights under TARP

13  and HAMP, and related programs, and to require Wells Fargo to honor it commitments pursuant to those

14  programs."  The complaint alleges that Mr. Phipps "is an intended third-party beneficiary" of the

15  Servicer Participation Agreement "for which Wells Fargo has an obligation to act" for Mr. Phipps'

16  benefit.

17      The complaint pursues claims of breach of contract and promissory estoppel and under the Unfair

18  Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§ 17200, et seq.  The complaint further alleges that

19  the foreclosure sale of the property to Fannie Mae is void and seeks declaratory relief to that effect.  The

20  complaint's claims will be addressed below.

21                          **DISCUSSION**

22              **F.R.Civ.P. 12(b)(6) Motion To Dismiss Standards**

23      Defendants seek to dismiss the complaint's claims as lacking necessary supporting facts and

24  elements.

25      A F.R.Civ.P. 12(b)(6) motion to dismiss is a challenge to the sufficiency of the pleadings set

26  forth in the complaint. "When a federal court reviews the sufficiency of a complaint, before the reception

27  of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not

28  whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974); *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). A F.R.Civ.P. 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).

In resolving a F.R.Civ.P. 12(b)(6) motion, a court must: (1) construe the complaint in the light most favorable to the plaintiff; (2) accept all well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996). Nonetheless, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). A court "need not assume the truth of legal conclusions cast in the form of factual allegations," *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643, n. 2 (9th Cir.1986), and a court must not "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated . . . laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897 (1983). A court need not permit an attempt to amend if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). Moreover, a court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562, 127 S.Ct. at 1969 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

6

1    In *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937,1949 (2009), the U.S. Supreme Court recently

2  explained:

3        To survive a motion to dismiss, a complaint must contain sufficient factual
       matter, accepted as true, to "state a claim to relief that is plausible on its face." . . . A
4      claim has facial plausibility when the plaintiff pleads factual content that allows the court
       to draw the reasonable inference that the defendant is liable for the misconduct alleged.
5      . . . The plausibility standard is not akin to a "probability requirement," but it asks for
       more than a sheer possibility that a defendant has acted unlawfully. (Citations omitted.)

6

7    After discussing *Iqbal*, the Ninth Circuit Court of Appeals summarized: "In sum, for a complaint

8  to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that

9  content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret*

10  *Service*, 572 F.3d 962, 989 (9th Cir. 2009) (quoting *Iqbal*, __ U.S. __, 129 S.Ct. at 1949).

11    The U.S. Supreme Court applies a "two-prong approach" to address a motion to dismiss:

12        First, the tenet that a court must accept as true all of the allegations contained in
       a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of
13      a cause of action, supported by mere conclusory statements, do not suffice. . . . Second,
       only a complaint that states a plausible claim for relief survives a motion to dismiss. . .
14      . Determining whether a complaint states a plausible claim for relief will . . . be a
       context-specific task that requires the reviewing court to draw on its judicial experience
15      and common sense. . . . But where the well-pleaded facts do not permit the court to infer
       more than the mere possibility of misconduct, the complaint has alleged – but it has not
16      "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

17        In keeping with these principles a court considering a motion to dismiss can
       choose to begin by identifying pleadings that, because they are no more than conclusions,
18      are not entitled to the assumption of truth. While legal conclusions can provide the
       framework of a complaint, they must be supported by factual allegations. When there are
19      well-pleaded factual allegations, a court should assume their veracity and then determine
       whether they plausibly give rise to an entitlement to relief.

20

21  *Iqbal*, __ U.S. __, 129 S.Ct. at 1949-1950.

22    For a F.R.Civ.P. 12(b)(6) motion, a court generally cannot consider material outside the

23  complaint. *Van Winkle v. Allstate Ins. Co.*, 290 F.Supp.2d 1158, 1162, n. 2 (C.D. Cal. 2003).

24  Nonetheless, "judicial notice may be taken of a fact to show that a complaint does not state a cause of

25  action." *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd*., 245 F.2d 67, 70 (9th Cir. 1956); *see*

26  *Estate of Blue v. County of Los Angeles*, 120 F.3d 982, 984 (9th Cir. 1997).  A court properly may take

27  judicial notice of matters of public record outside the pleadings and consider them for purposes of the

28  motion to dismiss.  *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

With these standards in mind, this Court turns to defendants' challenges to Mr. Phipps' claims.

**Breach Of Contract**

The complaint's thrust is its (first) breach of contract claim that Wells Fargo breached its obligations by:

1.   Failing to provide Mr. Phipps "the opportunity to accept permanent loan modifications for which he was eligible"; and

2.   Accepting Mr. Phipps' request for an extension of the loan modification offer but foreclosing on the property within the extension period.

The breach of contract claim further alleges that Mr. Phipps "was ready, willing and able to consummate a loan modification within the HAMP guidelines of 31% of his take-home pay."

Mr. Phipps attributes the breach of contract claim to allege a third-party beneficiary theory under the Servicer Participation Agreement and a direct breach claim against Wells Fargo.  Defendants fault the breach of contract claim in that Mr. Phipps is not a third-party beneficiary under the Servicer Participation Agreement, HAMP at most required consideration of loan modification, there is no private right of action under HAMP, and the complaint fails to satisfy breach of contract elements.

***Third-Party Beneficiary***

Defendants argue that Mr. Phipps is not an intended beneficiary under the Servicer Participation Agreement to bar his breach of contract claim.

The parties agree that federal law governs interpretation of the Servicer Participation Agreement and related documents.  Federal law controls the interpretation of a contract entered into pursuant to federal law and to which the United States is a party.  *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1243 (9th Cir.2009), *pet. for cert. filed*, 78 U.S.L.W. 3644 (U.S. Apr. 21, 2010) (No. 09-1273). The Servicer Participation Agreement was entered into between Wells Fargo and Fannie Mae in Fannie Mae's capacity as a financial agent of the United States to render the Servicer Participation Agreement subject to interpretation under federal law.

The parties further agree that whether Mr. Phipps is a third-party beneficiary under the Servicer Participation Agreement is determined by federal law.  Under federal common law only an intended beneficiary may enforce a contract as a third-party beneficiary:

8

**[B]efore a third party can recover under a contract, it must show that the contract was made for its direct benefit – that it is an *intended beneficiary* of the contract.** A promisor owes a duty of performance to any intended beneficiary of the promise, and the intended beneficiary may enforce the duty by suing as a third party beneficiary of the contract, whereas an incidental beneficiary acquires no right against the promisor.

*Astra*, 588 F.3d at 1244 (internal quotation marks, brackets and citations omitted, emphases in *Astra*).

In *Astra*, 588 F.3d at 1244, the Ninth Circuit Court of Appeals further explained:

To qualify as an intended beneficiary, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party. Although intended beneficiaries need not be specifically or individually identified in the contract, they still must fall within a class clearly intended by the parties to benefit from the contract.

Demonstrating third-party beneficiary status in a government contract situation is particularly difficult: "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries rather than intended ones, and so may not enforce the contract absent a clear intent to the contrary."  *Astra*, 588 F.3d at 1244 (internal quotation marks and citations omitted, emphasis in original).

The Ninth Circuit further explained clearing the "clear intent" hurdle:

This "clear intent" hurdle is not satisfied by a contract's recitation of interested constituencies, vague, hortatory pronouncements, statements of purpose, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind.

*Astra*, 588 F.3d at 1244.

To determine whether a party is an intended beneficiary of a government contract, a court must examine "the precise language of the contract for a clear intent to rebut the presumption that the third parties are merely incidental beneficiaries." *Astra*, 588 F.3d at 1244 (internal quotation marks, brackets and citations omitted). Specifically, a court examines the contract as a whole and "weigh[s] the circumstances of the transaction." *Astra,* 588 F.3d at 1245 (internal quotation marks and citations omitted). "[W]hen a contract is mandated by a federal statute, [this] includes the governing statute and its purpose." *Astra*, 588 F.3d at 1245(internal quotation marks and citations omitted).

Moreover, "if the plaintiff is an intended beneficiary . . . then the third party contract claim may go forward.  Only when the plaintiff would qualify solely as an incidental beneficiary of the government contract is it necessary to have an express, specific statement of the promisor's contractual liability to

that third party (such as by an express right-to-sue clause)." *Astra*, 588 F.3d at 1245.

Defendants contend that the Servicer Participation Agreement neither gives borrowers rights nor expressly intends to confer third-party beneficiary status on borrowers. The Servicer Participation Agreement does not state that the servicer "must modify all mortgages that meet the eligibility requirements." *Escobedo v. Countrywide Home Loans, Inc.*, 2009 WL 4981618, at *3 (S.D. Cal. 2009). The Servicer Participation Agreement "nowhere states that it gives borrowers any rights or otherwise expressly intends to confer third party beneficiary status on borrowers." *Benito v. Indymac Mortg. Services*, 2010 WL 2130648, at *7 (D.Nev. 2010). A fellow judge of this Court has explained:

> Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary. . . . Furthermore, a qualified borrower to a HAMP agreement "would not be reasonable in relying on the Agreement as manifesting an intention to confer a right on him because the Agreement does not require [a servicer] modify eligible loans." . . . Therefore, "qualified borrowers are incidental beneficiaries of the Agreement and do not have enforceable rights under the contract." [citation omitted].

*Zendejas v. GMAC Wholesale Mortg. Corp.*, 2010 WL 2629899, at * 4 (E.D. Cal. 2010).

Relying on unpublished district court orders, Mr. Phipps argues that "plaintiffs may indeed be third-party beneficiaries and thus enforce the terms of HAMP." Mr. Phipps argues that under the unambiguous terms of the Servicer Participation Agreement, Mr. Phipps "had a right to have his loan considered for modification." Mr. Phipps points to Servicer Participation Agreement statements that "Servicer shall perform the loan modification and other foreclosure prevention services" described in documents, including HAMP Guidelines. Without identifying the particular portion of the Servicer Participation Agreement, Mr. Phipps claims it obligated Wells Fargo to "service all eligible loans under the rules of the program unless explicitly prohibited by contract." Mr. Phipps concludes that since his loan qualified under HAMP, "he was an intended third-party to the 'loan modification and other foreclosure prevention services.'"

The Servicer Participation Agreement does not state expressly that it is for borrowers' benefit. The Servicer Participation Agreement obligates Wells Fargo to perform "loan modification and other foreclosure prevention services" for "all mortgage loans it services," to "use reasonable efforts to remove all prohibitions or impediments to its authority," and "to obtain all third party consensus and waivers that are required, by contract or law, in order to effectuate any modification of a mortgage loan" under

HAMP.  HAMP supporting guidelines require servicers, such as Wells Fargo, to "consider all eligible loans" and to "use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties."

The Servicer Participation Agreement and HAMP guidelines direct Wells Fargo to modify loans, to evaluate criteria to determine loan modification, and specify how to modify eligible loans.  The import of the Servicer Participation Agreement in the context of its enabling legislation is provide loan modification to eligible borrowers.  "The Agreement on its face expresses a clear intent to directly benefit eligible borrowers." *Marques v. Wells Fargo Home Mortg., Inc.*, 2010 WL 3212131, a *6 (S.D. Cal. 2010) ("Plaintiff at the very least had a right to have his loan considered for modification.")

At best for Mr. Phipps, the Servicer Participation Agreement committed Wells Fargo to consider HAMP loan modification subject to eligibility criteria.  The Servicer Participation Agreement did not require Wells Fargo to provide Mr. Phipps a HAMP loan modification.  This Court agrees with other district courts that Mr. Phipps is no more than an incidental beneficiary under the Servicer Participation Agreement and is not entitled to rely on the Servicer Participation Agreement to manifest an intent to confer rights on to him.

Moreover, the complaint lacks facts that Mr. Phipps was eligible for a HAMP loan modification.  Although the complaint lists HAMP eligibility criteria, it lacks facts that Mr. Phipps met the criteria.  The complaint raises inferences that Mr. Phipps did not meet HAMP loan modification criteria in that he considered Wells Fargo's non-HAMP loan modification offers and "was resolute in attempting to work with Wells Fargo to save the Home, even if it meant taking the loan outside HAMP guidelines."  Mr. Phipps cannot establish third-party beneficiary status for benefits to which he was not eligible.  At best, the complaint alleges that Mr. Phipps attempted a HAMP loan modification, not that he was eligible and wrongly denied.  The complaint lacks facts to support a third-party beneficiary theory of relief.

### No Private Right Of Action Under HAMP

Defendants note that HAMP provides no private right of action to defeat the breach of contract claim.

A fellow district court explains the absence of a private right of action under HAMP:

On October 8, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110-343, 122 Stat. 3765 (codified 12 U.S.C. § 5201 et seq.) ("EESA"). Section 109 required the Secretary of the Treasury ("the Secretary") to take certain measures in order to encourage and facilitate loan modifications. 12 U.S.C. § 5219. However, Section 109 did not create any private right of action against servicers for grievances relating to the EESA. *Ramirez v. Litton Loan Serv.*, LP, 2009 WL 1750617, *1 (D.Ariz.2009); *Barrey v. Ocwen Loan Serv., LLC*, 2009 WL 1940717, * 1 (D.Ariz.2009).

. . .

Per designation by the Secretary, Freddie Mac serves as compliance officer for the HAMP. U.S. Dep't of Treasury, Supplemental Directive 2009-08, at 4 (Nov. 3, 2009). The HAMP requires mortgagees to collect, retain, and transmit mortgagor and property data to Freddie Mac in order to ensure compliance with the program. *See* Supplemental Directive 2009-01, at 13-14, 19-21 (Apr. 6, 2009); Supplemental Directive 2009-06 (Sept. 11, 2009). As the compliance agent, Freddie Mac is charged with conducting "independent compliance assessments" including "evaluation of documented evidence to confirm adherence . . . to HAMP requirements" such as the evaluation of borrower eligibility. Supplemental Directive 2009-01, at 25-26.

Nowhere in the HAMP Guidelines, nor in the EESA, does it expressly provide for a private right of action. Rather, Congressional intent expressly indicates that compliance authority was delegated solely to Freddie Mac. By delegating compliance authority to one entity, Freddie Mac, Congress intended that a private cause of action was not permitted. *See Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 865 (4th Cir.2001) (reiterating that "the doctrine of expressio unis est exclusio alterius instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded.").

*Marks v. Bank of America, N.A.*, 2010 WL 2572988, at *5, 6 (D. Az. 2010).

In the absence of a private right of action under HAMP, Mr. Phipps' breach of contract claim fails. Mr. Phipps' claim that he does not seek a "private cause of action" is unsupported and of no avail.

### *Elements*

In addition to the absence of legal grounds to support third-party beneficiary remedies or a private right of action, defendants fault the breach of contract claim's absence of facts to support breach of contract elements.

"The standard elements of a claim for breach of contract are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'"   *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178, 80 Cal.Rptr.3d 6 (2008).   "To form a contract, an 'offer must be sufficiently definite . . . that the performance promised is reasonably certain.'"   *Alexander v. Codemasters Group Limited*, 104 Cal.App.4th 129, 141. 127 Cal.Rptr.2d 145 (2002).

1    Essential elements to contract existence are: (1) "[p]arties capable of contracting;" (2) "[t]heir

2  consent;" (3) a "lawful object;" and (4) a "sufficient cause or consideration." Cal. Civ. Code, § 1550.

3    Defendants challenge the breach of contract claim's allegation that "Wells Fargo has breached

4  its duties by failing to provide Plaintiff . . . with the opportunity to accept permanent loan modifications

5  for which he was eligible." Defendants argue that in the absence of a right to loan modification under

6  HAMP or the Making Home Affordable Program, Wells Fargo lacked an obligation or duty for a breach

7  of contract claim. Defendants point out that HAMP and Making Home Affordable Program guidelines

8  require:

9      1.    Borrowers to meet eligibility requirements and to submit required documentation;

10      2.    A loan to qualify for modification;

11      3.    A trial period if modification is offered; and

12      4.    Borrowers to make all necessary payments under the trial period prior to a permanent

13            modification offer.

14  Defendants note the complaint's absence of allegations that Mr. Phipps was eligible under HAMP and

15  qualified for HAMP modification given the complaint's conclusory allegation that Mr. Phipps "qualified

16  under HAMP and likely qualified under HARP [Home Affordable Refinance Program]." Defendants

17  further note that the complaint identifies only eligibility requirements for evaluation, not modification

18  qualifications. Defendants point to the following HAMP guidelines:

19      A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be
        reduced by at least 0.125 percent without the modified monthly mortgage payment ratio
20      going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage
        payment ratio to the target of 31 percent, the modification will not satisfy HAMP
21      requirements and no incentives will be payable in connection with the modification.

22  *Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages Version 3.0,* section

23  6.3.

24  Defendants conclude that if Mr. Phipps "could not qualify, there would be no offer of a HAMP

25  modification."

26    Pointing to HAMP guidelines documentation, Mr. Phipps claims that Wells Fargo was obligated

27  to work with Mr. Phipps "to determine if the HAMP is appropriate," "to validate the homeowner's

28  eligibility for HAMP and capacity to pay," to offer eligible borrowers HAMP participation prior to

1   foreclosure, to forego foreclosure during the "trial period," and to send a "Borrower Notice" for failure

2   to provide required financial documentation and to state reasons for "non-approval." Mr. Phipps accuses

3   defendants of failing to use reasonable efforts to effectuate loan modification, to consider Mr. Phipps

4   for loan modification, and to provide notice to Mr. Phipps "regarding not being offered a HAMP

5   modification" and of "all other available foreclosure prevention options." Mr. Phipps further accuses

6   defendants of "[c]ontinuing the foreclosure process during the time it was not allowed to do so under

7   HAMP."

8       As noted above, the key problem for Mr. Phipps is the complaint's absence of facts that Mr.

9   Phipps was eligible for a HAMP loan modification. The obligations to which Mr. Phipps seeks to assign

10  to defendants are contingent on HAMP eligibility. The complaint merely lists eligibility criteria, not

11  facts that Mr. Phipps met them. Moreover, Mr. Phipps' pulling a few phrases from HAMP guidelines

12  in the abstract does not translate to defendants' contractual obligations to him. Defendants correctly note

13  the absence of facts to support breach of contract elements.

14                          ***Foreclosure During Extension***

15      Defendants further challenge the breach of contract allegation that Wells Fargo extended the

16  deadline to accept a proposed loan modification "but then breached its obligations to Plaintiff by

17  foreclosing on his Home within the extension period." Defendants fault failure to allege contract

18  existence given no indication whether the alleged extension was oral or written. Defendants further fault

19  the absence of pleading consideration in that Mr. Phipps promised nothing more than his existing

20  obligation to make loan payments. Defendants challenge the absence of Mr. Phipps' performance in that

21  the complaint does not allege that Mr. Phipps returned necessary paperwork to enter into the proposed

22  modification and to fulfill "his end of the bargain." Lastly, defendants point to the absence of Mr.

23  Phipps' damages given Mr. Phipps' default and failure to reinstate the loan and to meet modification

24  requirements, Wells Fargo's entitlement to foreclose, and Mr. Phipps' lack of an entitled HAMP benefit.

25      Mr. Phipps responds that Wells Fargo had given him "an option to accept the terms of a loan

26  modification within a certain time period. If this is not a valid contract, then no option contract could

27  ever be binding."

28      Mr. Phipps' option contract analogy is unavailing. The complaint merely alleges that Wells

1   Fargo granted an extension "to return the loan modification." The complaint lacks a further description
2   of granting Mr. Phipps an extension. Mr. Phipps attempts to convert the extension into a modification.
3   Mr. Phipps' request for an extension is not his outright acceptance of an offer to bind defendants.
4   Defendants raise valid points that granting of an extension fails to satisfy elements to support a breach
5   of contract claim. The complaint lacks a viable breach of contract claim, and no facts are apparent to
6   invigorate such a claim to warrant an attempt at amendment.

7        Moreover, Mr. Phipps is unable to enforce a gratuitous oral promise to forebear a foreclosure sale
8   and thus modify the DOT. A contract in writing may not be altered by an executory oral agreement.
9   *Karlsen v. American Sav. & Loan Assn.*, 15 Cal.App.3d 112, 121, 92 Cal.Rptr. 851 (1971) (citing Cal.
10  Civ. Code, § 1698)). "An agreement to postpone a valid sale of property beyond the date when said
11  property may be sold under and according to the terms of the trust deed obviously is an agreement to
12  alter the terms of the instrument . . . To hold otherwise would reduce a trust deed in any case to an
13  unsubstantial if not worthless security." *Stafford v. Clinard*, 87 Cal.App.2d 480, 481, 197 P.2d 84
14  (1948); *See Nguyen v. Calhoun,* 105 Cal.App.4th 428, 445, 129 Cal.Rptr.2d 436 (2003) ("the foreclosure
15  sale may not be set aside based on the lender's alleged breach of an oral agreement to postpone the
16  trustee's sale.")

17       The breach of contract claim is subject to dismissal without an attempt at amendment.

18                                  **Promissory Estoppel**

19       The complaint's (second) promissory estoppel claim alleges that Mr. Phipps continued to make
20  mortgage payments "expecting that he would be able" to remain on the property based on Wells Fargo's
21  representations that it would approve him for a HAMP loan modification and would extend time to
22  respond to Wells Fargo's loan modification offer.

23       Defendants fault the complaint's failure to allege promissory estoppel elements. Defendants
24  characterize the promissory estoppel claim as "a last-ditch attempt to overcome the fatal flaws of the
25  breach of contract claims."

26                                      *Elements*

27       Under the promissory estoppel doctrine, "a promisor is bound when he should reasonably expect
28  a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can

be avoided only by its enforcement." *Youngman v. Nevada Irrigation Dist.*, 70 Cal.2d 240, 249, 74 Cal.Rptr. 398 (1969); *see Lloyd v. R.K.O. Pictures, Inc.*, 136 Cal.App.2d 638, 299, 289 P.2d 295 (1955) ("Promissory estoppel is defined as a"promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.")  Promissory estoppel elements are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Laks v. Coast Fed. Sav. & Loan Assn.*, 60 Cal.App.3d 885, 891, 131 Cal.Rptr. 836 (1976); *see Toscano v. Greene Music*, 124 Cal.App.4th 685, 692, 21 Cal.Rptr.3d 732 (2004).

Promissory estoppel is "a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced." *Raedeke v. Gibraltar Sav. & Loan Assn.,* 10 Cal.3d 665, 672,111 Cal.Rptr. 693 (1974).  A"promise is an indispensable element of the doctrine of promissory estoppel," which "cannot be invoked and must be held inapplicable in the absence of a showing that a promise had been made upon which the complaining party relied to his prejudice." *Division of Labor Law Enforcement v. Transpacific Transportation Co.,* 69 Cal.App.3d 268, 277, 137 Cal.Rptr. 855 (1977).  "Estoppel cannot be established from . . . preliminary discussions and negotiations." *National Dollar Stores v. Wagnon*, 97 Cal.App.2d 915, 919, 219 P.2d 49 (1950).

Defendants argue that the complaint fails to allege a clear promise providing a basis to determine to which obligations the parties agreed.  Defendants point to the absence of facts of a Wells Fargo promise given the complaint's reference to Wells Fargo's representations to Mr. Phipps.  Defendants further note the absence of allegations that Wells Fargo promised to provide HAMP loan modification or not to foreclose until an unspecified date.

Mr. Phipps responds that "Wells Fargo promised it would not foreclose on the property until a date certain and would allow Plaintiff that full amount of time to consider the proposed loan modification."  Although Mr. Phipps makes such claims in his opposition papers, he points to no corresponding allegation in his complaint.  The complaint identifies no "date certain" to delay

16

foreclosure. The complaint merely attributes to Wells Fargo representations that it would approve Mr. Phipps for a loan modification within HAMP guidelines and would extend the time to respond to Wells Fargo's offer. Such representations do not amount to promises not to foreclose. The foreclosure resulted from Mr. Phipps' failure to make loan payments.

Mr. Phipps also relies on his purchase of fuel based on assurances that Wells Fargo would work with him. Assurances to work with Mr. Phipps do not equate to a promise to support promissory estoppel. Defendants are correct that the fuel purchase does not equate to "substantial reliance sufficient to overturn the otherwise valid foreclosure proceedings." Mr. Phipps points to no promise alleged in the complaint to base a promissory estoppel claim. Neither complaint allegations nor inferences therefrom equate to a necessary promise. The promissory estoppel claim fails, and Mr. Phipps offers nothing to resurrect it.

### Absence Of Particularity Pleading Standard – Fraud

Defendants characterize as fraud to require "requisite specficity" the promissory estoppel allegations that Wells Fargo represented to Mr. Phipps that Wells Fargo "would (a) approve him for a loan modification within the HAMP guidelines, and (b) that it would extend the time required to respond to the final offer which was not in compliance with the HAMP guidelines."

The elements of a California fraud claim are: (1) misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of the falsity (or "scienter"); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377 (1996). The same elements comprise a cause of action for negligent misrepresentation, except there is no requirement of intent to induce reliance. *Caldo v. Owens-Illinois, Inc.*, 125 Cal.App.4th 513, 519, 23 Cal.Rtpr.3d 1 (2004).

"[T]o establish a cause of action for fraud a plaintiff must plead and prove in full, factually and specifically, all of the elements of the cause of action." *Conrad v. Bank of America*, 45 Cal.App.4th 133, 156, 53 Cal.Rptr.2d 336 (1996). There must be a showing "that the defendant thereby intended to induce the plaintiff to act to his detriment in reliance upon the false representation" and "that the plaintiff actually and justifiably relied upon the defendant's misrepresentation in acting to his detriment." *Conrad*, 45 Cal.App.4th at 157, 53 Cal.Rptr.2d 336. "The absence of any one of these required elements

1  will preclude recovery." *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 1332, 231

2  Cal.Rptr. 355 (1986).

3         F.R.Civ.P. 9(b) requires a party to "state with particularity the circumstances constituting fraud."[3]

4  In the Ninth Circuit, "claims for fraud and negligent misrepresentation must meet Rule 9(b)'s

5  particularity requirements." *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1141 (C.D.

6  Cal. 2003).  A court may dismiss a claim grounded in fraud when its allegations fail to satisfy F.R.Civ.P.

7  9(b)'s heightened pleading requirements.  *Vess*, 317 F.3d at 1107.[4]  A motion to dismiss a claim

8  "grounded in fraud" under F.R.Civ.P. 9(b) for failure to plead with particularity is the "functional

9  equivalent" of a F.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim.  *Vess*, 317 F.3d at

10  1107. As a counter-balance, F.R.Civ.P. 8(a)(2) requires from a pleading "a short and plain statement of

11  the claim showing that the pleader is entitled to relief."

12         F.R.Civ.P. 9(b)'s heightened pleading standard "is not an invitation to disregard Rule 8's

13  requirement of simplicity, directness, and clarity" and "has among its purposes the avoidance of

14  unnecessary discovery." *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996).  F.R.Civ.P 9(b) requires

15  "specific" allegations of fraud "to give defendants notice of the particular misconduct which is alleged

16  to constitute the fraud charged so that they can defend against the charge and not just deny that they have

17  done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). "A pleading is sufficient

18  under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an

19  adequate answer from the allegations."  *Neubronner v. Milken*, 6 F.3d 666, 671-672 (9th Cir. 1993)

20  (internal quotations omitted; citing *Gottreich v. San Francisco Investment Corp.*, 552 F.2d 866, 866 (9th

21  Cir. 1997)).  The Ninth Circuit has explained:

22         Rule 9(b) requires particularized allegations of the circumstances *constituting* fraud.  The
           time, place and content of an alleged misrepresentation may identify the statement or the

23

24         [3]      F.R.Civ.P. 9(b)'s particularity requirement applies to state law causes of action: "[W]hile a federal court
       will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the

25     Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule." *Vess
       v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.

26     1995)(italics in original).

27         [4]      "In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that
       course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and

28     the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess*, 317 F.3d at 1103-1104.

1
2
3
4
5
6

> omission complained of, but these circumstances do not "constitute" fraud. The statement in question must be false to be fraudulent. Accordingly, our cases have consistently required that circumstances indicating falseness be set forth. . . . [W]e [have] observed that plaintiff must include statements regarding the time, place, and *nature* of the alleged fraudulent activities, and that "mere conclusory allegations of fraud are insufficient." . . . The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading. . . .
>
> In certain cases, to be sure, the requisite particularity might be supplied with great simplicity.

7   *In Re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1547-1548 (9th Cir. 1994) (en banc) (italics in

8   original) *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal*

9   *Pharm. Corp.*, 927 F.Supp. 1297 (C.D. Cal. 1996); *see Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir.

10  1997) (fraud allegations must be accompanied by "the who, what, when, where, and how" of the

11  misconduct charged); *Neubronner*, 6 F.3d at 672 ("The complaint must specify facts as the times, dates,

12  places, benefits received and other details of the alleged fraudulent activity.")

13      In a fraud action against a corporation, a plaintiff must "allege the names of the persons who

14  made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they

15  said or wrote, and when it was said or written." *Tarmann v. State Farm Mut. Auto. Ins. Co.*

16  2 Cal.App.4th 153, 157, 2 Cal.Rptr.2d 861 (1991).

17      Defendants argue that the complaint lacks facts of an alleged misrepresentation in that the

18  complaint does not allege that Wells Fargo promised to forego foreclosure. Defendants criticize the

19  absence of allegations of "when the alleged promise took place or who made the alleged promise."

20  Defendants point to an absence of damages from fraud given Mr. Phipps' admitted loan default to invoke

21  Wells Fargo's right to initiate foreclosure and the absence of Mr. Phipps' "absolute right to a loan

22  modification."

23      The complaint's conclusory allegations fail to meet Rule 9(b)'s strict standard. The complaint

24  lacks facts to support fraud elements let alone the who, what, when, when and how of alleged

25  misconduct. Mere allegations of representation is insufficient to warrant dismissal of the complaint's

26  claims to the extent they sound in fraud. Morever, the complaint lacks allegations that defendants

27  promised or represented that Mr. Phipps was entitled to loan modification to further doom a claim

28  sounding in fraud.

**UCL**

The complaint's third claim alleges violation of the UCL that Wells Fargo engaged in "bait and switch" by leading Mr. Phipps to believe "he was approved for a HAMP modification and then providing offers substantially higher than the 31% ratio authorized by HAMP."

"The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 949, 119 Cal.Rptr.2d 296 (2002). "Unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law (§ 17500 et seq.)]." *Kasky*, 27 Cal.4th at 949, 119 Cal.Rptr.2d 296 (citing Cal. Bus. & Prof. Code, § 17200)).  The UCL establishes three varieties of unfair competition – "acts or practices which are unlawful, or unfair, or fraudulent." *Shvarts v. Budget Group, Inc.*, 81 Cal.App.4th 1153, 1157, 97 Cal.Rptr.2d 722 (2000).

"A plaintiff alleging unfair business practices under these statutes [UCL] must state with reasonable particularity the facts supporting the statutory elements of the violation." *Khoury v. Maly's of California, Inc.*, 14 Cal.App.4th 612, 619, 17 Cal.Rptr.2d 708 (1993).

Defendants fault the UCL claim's reliance on "an unfair and deceptive business practice" and failure to specify whether Mr. Phipps pursues an unlawful, unfair or fraudulent act or practice. Defendants further fault the complaint's failure to describe "how the alleged conduct is unfair or deceptive."

### *Unfair Act Or Practice*

In consumer cases, such as this, the California Supreme Court has not established a definitive test to determine whether a business practice is unfair. *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal.App.4th 247, 256, 106 Cal.Rptr.3d 46 (2010).  A split of authority has developed among the California Courts of Appeal, which have applied three tests for unfairness in consumer cases. *Drum*, 182 Cal.App.4th at 256, 106 Cal.Rptr.3d 46.

The test applied in one line of cases requires "that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions." *Drum*, 182 Cal.App.4th at 256, 106 Cal.Rptr.3d 46

1   (citing *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1260-1261, 39 Cal.Rptr.3d 634 (2006);

2   *Davis v. Ford Motor Credit Co.*, 179 Cal.App.4th at 581, 595-596, 101 Cal.Rptr.3d 697 (2009); *Gregory*

3   *v. Albertson's Inc.*,104 Cal.App.4th 845, 854, 128 Cal.Rptr.2d 389 (2002).

4         Defendants argue that the complaint fails to allege a "cognizable violation of any statutory or

5   regulatory provision, or any significant harm to competition" and thus does not "tether" a UCL claim

6   to a "violation of any statutory or regulatory violation."  Mr. Phipps points to no statutory or regulatory

7   violation to support a UCL claim.

8         A second line of cases applies a test to determine whether the alleged business practice "is

9   immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the

10  court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged

11  victim." *Drum*, 182 Cal.App.4th at 257, 106 Cal.Rptr.3d 46 (citing *Bardin*, 136 Cal.App.4th at 1260,

12  39 Cal.Rptr.3d 634; *Davis*, 179 Cal.App.4th at 594-595, 101 Cal.Rptr.3d 697)).

13        Defendants fault the complaint's absence of allegations of a Wells Fargo practice that was

14  immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, especially given

15  that the DOT permits non-judicial foreclosure upon a borrower's default.  Defendants note the absence

16  of misrepresentation allegations.

17        Mr. Phipps responds that Wells Fargo led Mr. Phipps to believe that Wells Fargo participated

18  "in a widely publicized government program to modify distressed mortgages" and would adhere to the

19  Servicer Participation Agreement.  Without pointing to particular allegations, Mr. Phipps contends that

20  "a trier of fact could find Defendant's outright refusal to comply with its mandate under HAMP to be

21  contrary to public policy, immoral, unethical, oppressive, and substantially injurious to consumers."

22        Mr. Phipps offers nothing meaningful to support a UCL claim based on immoral, unethical,

23  oppressive, unscrupulous or injurious practices.  The complaint lacks facts to support such a claim.

24        The test applied in a third line of cases draws on the definition of "unfair" in section 5 of the

25  Federal Trade Commission Act (15 U.S.C. § 45, subd. (n)), and requires that "(1) the consumer injury

26  must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers

27  or competition; and (3) it must be an injury that consumers themselves could not reasonably have

28  avoided." *Drum*, 182 Cal.App.4th at 257, 106 Cal.Rptr.3d 46 (citing *Davis*, 179 Cal.App.4th 597-598,

1   101 Cal.Rptr.3d 697; *Camacho v. Automobile Club of Southern California,* 142 Cal.App.4th 1394, 1403,

2   48 Cal.Rptr.3d 770 (2006)).

3       Defendants point to absence of an alleged injury which Mr. Phipps could not reasonably have

4   avoided in that his default triggered Wells Fargo's right to foreclose.  Mr. Phipps offers nothing

5   meaningful to substantiate an unfair practice under the third line of cases.

6       The complaint lacks a UCL unfair act or practice claim, and Mr. Phipps offers nothing to support

7   amendment to attempt to plead such a claim.

8                           ***Fraudulent Act Or Practice***

9       The "fraudulent" prong under the UCL requires a plaintiff to "show deception to some members

10  of the public, or harm to the public interest," *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,*

11  178 F.Supp.2d 1099, 1121 (C.D. Ca. 2001), or to allege that "members of the public are likely to be

12  deceived." *Medical Instrument Development Laboratories v. Alcon Laboratories*, 2005 WL 1926673,

13  at *5 (N.D. Cal. 2005).  A UCL claim based on the "fraudulent" prong must allege reliance.  *In re*

14  *Tobacco II Cases*, 46 Cal.4th 298, 328, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009); *Cattie v. Wal-Mart*

15  *Stores, Inc.*, 504 F.Supp.2d 939, 947-49 (S.D.Cal.2007).  F.R.Civ.P. 9(b)'s heightened pleading

16  standards apply to claims for UCL claims are based on a fraudulent course of conduct. *Kearns v. Ford*

17  *Motor Co.*, 567 F.3d 1120, 1124 (9th Cir.2009).

18      Defendants fault the absence of facts of "fraudulent conduct" given the complaint's mere

19  reference to Wells Fargo's alleged "unfair and deceptive business practice."  Defendants note the

20  absence of allegations that Wells Fargo promised to forego to foreclose or advised Mr. Phipps not to

21  pursue alternative avenues to remedy his default.

22      Defendants are correct.  The complaint lacks a UCL fraudulent act or practice claim, and Mr.

23  Phipps offers nothing to support amendment to attempt to plead such a claim.

24                           ***Unlawful Act Or Practice***

25      Defendants explain that a UCL "unlawful" prong claim requires an underlying violation of law.

26  The UCL prohibits "unlawful" practices "forbidden by law, be it civil or criminal, federal, state, or

27  municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal.App.4th 832, 838,

28  33 Cal.Rptr.2d 438 (1999).  The UCL "thus creates an independent action when a business practice

                                        22

violates some other law." *Walker*, 98 Cal.App.4th at 1169, 121 Cal.Rptr.2d 79.  According to the California Supreme Court, the UCL "borrows" violations of other laws and treats them as unlawful practices independently actionable under the UCL. *Farmers Ins. Exchange v. Superior Court,* 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487 (1992).

A fellow district court has explained the borrowing of a violation of law other than the UCL:

> To state a claim for an "unlawful" business practice under the UCL, a plaintiff must assert the violation of any other law. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999) (stating, "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other law and treats them as unlawful practices that the unfair competition law makes independently actionable.") (citation omitted). Where a plaintiff cannot state a claim under the "borrowed" law, she cannot state a UCL claim either. *See, e.g., Smith v. State Farm Mutual Automobile Ins. Co.*, 93 Cal.App.4th 700, 718, 113 Cal.Rptr.2d 399 (2001). Here, Plaintiff has predicated her "unlawful" business practices claim on her TILA [Truth in Lending Act] claim. However, as discussed above, Plaintiff's attempt to state a claim under TILA has failed. Accordingly, Plaintiff has stated no "unlawful" UCL claim.

*Rubio*, 572 F.Supp.2d at 1168.

Defendants point to the complaint's failure to allege or identify a violation of law to support a UCL claim.  Defendants are correct.  The complaint lacks a UCL unlawful act or practice claim, and Mr. Phipps offers nothing to support amendment to attempt to plead such a claim.

### **Declaratory Relief**

The complaint's fourth claim is entitled "Declaratory Relief" and alleges that "any purported sale of the Home was void ab initio as it violated the provisions of the California Civil Code relating to foreclosures."  The claim seeks declarations that Mr. Phipps has title to the property, that the property's transfer to Fannie Mae is void ab initio, and that Fannie Mae has no right, interest or title to the property.

Defendants point to the absence of an actual controversy to support a declaratory relief claim in that the foreclosure has extinguished the note and DOT which gave rise to Mr. Phipps' rights and obligations.  Mr. Phipps responds that "the agreement to postpone . . . created no interest in Fannie Mae."

The Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202, provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief

is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. §2201(a).

The DJA's operation "is procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463 (1937).  "A declaratory judgment is not a theory of recovery." *Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 775 (1st Cir. 1994).  The DJA "merely offers an *additional remedy* to litigants." *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 21 (2nd Cir. 1997) (italics in original).  A DJA action requires a district court to "inquire whether there is a case of actual controversy within its jurisdiction." *American States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994).

As to a controversy to invoke declaratory relief, the question is whether there is a "substantial controversy, between parties having adverse legal rights, or sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941).  The U.S. Supreme Court has further explained:

> A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Haworth*, 300 U.S. at 240-241, 57 S.Ct. at 464 (citations omitted).

The failure of the complaint as a whole demonstrates the absence of an actual controversy subject to declaratory relief.  A declaratory relief action "brings to the present a litigable controversy, which otherwise might only be tried in the future." *Societe de Conditionnement v. Hunter Eng. Co., Inc.*, 655 F.2d 938, 943 (9th Cir. 1981).  In the absence of a viable claim, the complaint fails to support declaratory relief.

Defendants further note the absence of an actual controversy given that the complaint lacks allegations of irregularities in the foreclosure process.

"A properly conducted nonjudicial foreclosure sale constitutes a final adjudication of the rights of the borrower and lender." *Moeller*, 25 Cal.App.4th at 831, 30 Cal.Rptr.2d 777.  "As a general rule,

1   a trustee's sale is complete upon acceptance of the final bid." *Nguyen v. Calhoun*, 105 Cal.App.4th 428,

2   440-441, 129 Cal.Rptr.2d 436 (2003).  "If the trustee's deed recites that all statutory notice requirements

3   and procedures required by law for the conduct of the foreclosure have been satisfied, a rebuttable

4   presumption arises that the sale has been conducted regularly and properly; this presumption is

5   conclusive as to a bona fide purchaser." *Moeller*, 25 Cal.App.4th at 831, 30 Cal.Rptr.2d 777 (citations

6   omitted).  "A nonjudicial foreclosure sale is accompanied by a common law presumption that it 'was

7   conducted regularly and fairly.'" *Melendrez v. D & I Investment, Inc.*, 127 Cal.App.4th 1238, 1258, 26

8   Cal.Rptr.3d 413 (2005) (quoting *Brown v. Busch,* 152 Cal.App.2d 200, 204, 313 P.2d 19 (1957)).  "This

9   presumption may only be rebutted by substantial evidence of prejudicial procedural irregularity."

10  *Melendrez*, 127 Cal.App.4th at 1258, 26 Cal.Rptr.3d 413.

11       To challenge foreclosure, "it is necessary for the complaint to state a case within the code

12  sections for which reason it is essential to allege the facts affecting the validity and invalidity of the

13  instrument which is attacked." *Kroeker v. Hurlbert,* 38 Cal.App.2d 261, 266, 101 P.2d 101 (1940).

14  A "trustee or mortgagee may be liable to the trustor or mortgagor for damages sustained where there has

15  been an illegal, fraudulent or wilfully oppressive sale of property under a power of sale contained in a

16  mortgage or deed of trust." *Munger v. Moore*, 11 Cal.App.3d 1, 7, 89 Cal.Rptr. 323 (1970).

17       The complaint lacks facts of a specific statutory irregularity or misconduct in the foreclosure

18  proceedings.  Mr. Phipps' claim of an agreement to postpone the foreclosure sale is unsupported by

19  corresponding allegations in the complaint.  As noted above, the complaint merely alleges an extension

20  to consider loan modification and a representation to work with Mr. Phipps.  The complaint's conclusory

21  allegations provide nothing to support a discrepancy in the foreclosure process to warrant dismissal of

22  claims, including the declaratory relief claim.  The complaint lacks no allegations to overcome the

23  presumption of the foreclosure sale's validity.

## **CONCLUSION AND ORDER**

25       For the reasons discussed above, this Court:

26       1.      DISMISSES this action with prejudice; and

27       2.      DIRECTS the clerk to enter judgment against plaintiff Scott Phipps and in favor of

28               defendants Wells Fargo Bank, N.A., and Federal National Mortgage Association and to

1        close this action.

2        IT IS SO ORDERED.

3   **Dated:    January 27, 2011**                    /s/ Lawrence J. O'Neill
                                           UNITED STATES DISTRICT JUDGE

26